IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 11, 2005

## STATE OF TENNESSEE v. PATRICK LAMONT BARKER

**Direct Appeal from the Circuit Court for Montgomery County
No. 40200120-04-445     Michael R. Jones, Judge**

─────────────

**No. M2004-02000-CCA-R3-CD - Filed June 6, 2005**

─────────────

The Defendant, Patrick Lamont Barker, pled guilty to two counts of the sale of .5 grams or more of a schedule II controlled substance.  The trial court sentenced him to eight years on each conviction and ordered that the sentences run concurrently and be served in community corrections.  The Defendant violated the terms of his community corrections sentence, and the trial court ordered the Defendant to serve the remainder of his sentence in prison.  The Defendant now appeals.  Finding no error in the judgment of the trial court, we affirm the Defendant's sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Russell A. Church (at hearing) and Roger E. Nell (on appeal) Clarksville, Tennessee, for the appellant, Patrick Lamont Barker.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Daniel Brollier, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

        This appeal arises from the revocation of the Defendant's community corrections sentence and his subsequent incarceration in the Tennessee Department of Correction.  On April 19, 2002, the Defendant pled guilty to two counts of the sale of .5 grams or more of cocaine, a schedule II controlled substance. The trial court sentenced the Defendant, a Range I standard offender, to two concurrent eight year sentences, to be served in community corrections, and it fined the Defendant $2000.00 for each of the two offenses.  On December 18, 2002, the trial court issued a violation of community corrections warrant, based on an affidavit from the community corrections supervisor

claiming that the Defendant: (1) failed to seek employment, remain employed, or provide verification of employment; (2) failed to pay his court costs; (3) failed to perform community service work; (4) failed to report to the community corrections office once a week; and (5) failed to remain arrest free and report his arrest to the community corrections office.[1] On November 18, 2003, the Defendant waived his hearing and admitted his violations. Subsequently, the trial court partially revoked the Defendant's community corrections sentence, ordering that the Defendant serve his sentence in the workhouse until December 13, 2003, at which time he would return to community corrections.[2] On February 3, 2004, the trial court issued a second violation of community corrections warrant, based on an affidavit from the Defendant's community corrections supervisor claiming that, after the Defendant was reinstated to community corrections, the Defendant: (1) failed to report to the community corrections office once a week; (2) failed to pay his court costs; (3) failed to perform community service work; and (4) failed to provide proof of employment.

On July 14, 2004, at the community corrections violation hearing, the following evidence was presented: Capri Griffey-Elliott testified that she is a supervisor at the Montgomery/Robertson County Community Corrections office, and she was assigned to supervise the Defendant. She said that the Defendant was reinstated to community corrections on December 13, 2003. She testified that the Defendant was required to report to her office once a week, but he had reported only once since his reinstatement, on December 16, 2003. Griffey-Elliott said that the Defendant was required to seek to secure employment and to provide proof of such to her. She said that the Defendant did not provide any proof that he was seeking, or had obtained, employment. She testified that the Defendant failed to perform required community service after his reinstatement, but she noted that the Defendant had performed community service prior to the first revocation of his community corrections sentence. She said that, other than when the Defendant reported on December 13, she has had no contact with the Defendant since his reinstatement.

On cross-examination, Griffey-Elliott explained that, if the Defendant had come to her office when she was not there, the Defendant would have signed the sign-in sheet and filled out a weekly reporting form that would be placed in his file. She said that the Defendant's file contains only one form, from his report on December 16, and she said that she checked the sign-in logs but did not see the Defendant's name. Griffey-Elliott recalled that, prior to his first revocation, the Defendant was performing community service by working at the community corrections office. She confirmed that the Defendant's failure to do community service stems from his failure to report because the Defendant would have had to re-establish contact before he could be scheduled to volunteer in the community corrections office. She said that, when the Defendant reported on December 16, he had been out of jail for 3 days, and he did not have a job at that time. She testified that, prior to the first revocation, the Defendant reported that he lived at his family's home on Elder Street. The Defendant

---

[1] The affidavit indicates that the Defendant was arrested on November 8, 2002, for driving on a suspended license, harassment, and theft of property over $500.00.

[2] The trial court ordered that the Defendant serve 365 days in the workhouse, less credit for time served. The Defendant had 333 days credit: 50 days served before his guilty plea; 19 days served after his arrest on this violation warrant; and 264 days served in the community corrections program.

reported living at 608 Washington Street around September 2003, which was about forty-five to sixty days before his first probation revocation warrant was issued. Griffey-Elliott testified that, following his reinstatement, the Defendant reported that he lived at 608 Washington Street, and she said that she did not know who else lives at that address.

The Defendant testified that he "fel[t] like [he] came in and reported in," after December 16, on two occasions when Griffey-Elliott was not in her office. He said that he informed Griffey-Elliott that he intended to live at 608 Washington Street, in a two-bedroom apartment, with his cousin, Nicole Clardy, and her four children, and he said that he slept on the living room sofa. He said that he was not able to stay with Clardy full-time because Clardy and her four children, ranging in age from one to eight years old, wanted their privacy. The Defendant testified that his prior residence, his grandparents' house on Elder Street, was a three bedroom home. He said that four adults, including his mother, and seven or eight children lived in the Elder Street home. The Defendant acknowledged that he never explained to Griffey-Elliott the difficulties he was having with his living arrangements. He said that he would not be able to stay with his grandmother if he was released because his grandmother's house was repossessed, and she now lives in a two bedroom house with seven or eight other people. He would also not be able to stay with Clardy because her home is too crowded. The Defendant said that he has an eighteen-month-old child with his ex-girlfriend from two years prior, and, if reinstated to community corrections, he would "reintroduce [him]self to stay . . . with [his] baby's mother." The Defendant testified that, after he was reinstated to community corrections in December 2003, he did not have a full-time job. He said that he applied for positions cooking, "off and on, here and there." He explained that he also worked sporadically at his uncle's car wash and for a friend's lawn service. He said that, although he had failed at community corrections previously, if reinstated, he would "try to become the person that [he] guess[ed] that [he] is supposed to be."

On cross-examination, the Defendant testified that he spent time in jail before he was convicted and placed on community corrections. He admitted that he violated community corrections within the first eight months of his sentence. He said that he had understood the requirements of the community corrections sentence, including the requirement that he report to his community corrections supervisor once or twice a week. The Defendant recalled that he had seven or eight prior misdemeanor convictions, and he was previously placed on probation for those offenses. He admitted that he understood the reporting requirement from his prior probation.

Tanisha Pardue testified that the Defendant is her one year old child's step-father, and the Defendant is the father of her unborn child. She said that, before the Defendant's arrest, he took an active role in her life and helped support her and her child. Pardue said that, before the Defendant was arrested on his probation violation warrant, he was living with her at her house at 1138 Commerce Street. She said that the Defendant had been seeking employment before he was arrested. She recalled that the Defendant filled out job applications, but she was not sure what odd jobs he had done because she works two jobs. She explained that she works one day shift job four days a week, and one night shift job five days a week. She said that, despite her busy schedule, she would do what she could to assist the Defendant in meeting his obligations under a community corrections sentence.

On cross-examination, Pardue affirmed that the Defendant had lived with her for the seven months preceding the hearing, between his reinstatement to community corrections in December 2003 and his arrest on the violation warrant. She said that the Defendant was contributing at least $260.00 a month to their expenses during this period of time, and she affirmed that the Defendant was unemployed to the best of her knowledge.

Following this evidence, the trial court ordered the Defendant to serve the remainder of his sentence in the Tennessee Department of Correction. In doing so, the trial court stated:

> All right, the evidence in this case is that [the Defendant] was released from jail on December 13th of last year and reported on December 16th. And frankly, the proof is that he never, ever darkened the doors again.
>
> [The Defendant] has testified as to living certain places and that's been contradicted by the other witnesses who testified -- the testimony is very credible as to what [the Defendant] has done and hasn't done. [Pardue] works very hard working two jobs. [the Defendant] has not managed to go back to work.
>
> There is no proof of any illegal activities on behalf of [the Defendant] in the sense of committing new crimes, but he has one violation before. He served three hundred sixty-five days in jail. . . . I don't see that I have any real alternative but to order that he serve the sentence. He just has not done what he is required to do. Community Corrections is a program that is a substitution for going to the penitentiary and when you don't do what you are supposed to do, you don't give the Court any alternative. The alternative of split confinement has already been fulfilled, I can't do that anymore.
>
> [The Defendant] will be required to serve that eight year sentence in the Tennessee Department of Corrections.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court abused its discretion in ordering that he serve the remainder of his sentences in prison. Specifically, he argues that the trial court only imposed the prison sentence because it mistakenly believed that it could not order further split confinement. The State counters that the trial court did not abuse its discretion.

Community corrections programs are governed by the Tennessee Community Corrections Act of 1985. See Tenn. Code Ann. § 40-36-101 (2003). The revocation of a community corrections

-4-

sentence is governed by Tennessee Code Annotated section 40-36-106(e)(4) (2003), which provides as follows:

> The court shall also possess the power to revoke the sentence imposed at any time due to the conduct of the defendant or the termination or modification of the program to which the defendant has been sentenced, and the court may resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration.

In order to revoke a community corrections sentence, the trial court must find by a preponderance of the evidence that the defendant has violated the terms of the agreement. State v. Harkins, 811 S.W.2d 79, 82-83 (Tenn. 1991). On appeal, a revocation will be upheld absent an abuse of discretion. In order for a reviewing court to find an abuse of discretion, it must be shown that the record contains "no substantial evidence to support the conclusion of the trial judge that a violation of the conditions . . . occurred." Id. Upon revoking the community corrections sentence, the trial court may, in its discretion, require the Defendant to serve his sentence in confinement. Tenn. Code Ann. § 40-36-106(e)(4). A trial court may alternatively order split confinement after the revocation of a community corrections sentence. See Tenn. Code Ann. §§ 40-36-106(f) and 40-35-306(a) (2003); Harkins, 811 S.W.2d at 82. Section 40-35-306 provides that the trial court may order up to one year of the defendant's sentence be served in confinement, with an alternative sentence for the remainder of time up to the statutory maximum. Tenn. Code Ann. § 40-35-306(a).

The record before us indicates that the trial court did not abuse its discretion. At the revocation hearing, the Defendant admitted that he was aware that he was required to report to the community corrections office once or twice a week, and he only claimed that he reported three times. His community corrections supervisor testified that the Defendant reported to her office only one time after his reinstatement to community corrections. The trial court found that the Defendant violated the reporting requirement of his sentence and that the Defendant had not been truthful regarding his living arrangements during the time of his reinstated community corrections sentence. Thus, there is clearly substantial evidence supporting the trial court's conclusion that the Defendant violated the terms of his community corrections sentence.

Additionally, the record does not indicate that the trial court ordered the Defendant to serve his sentence in confinement based on a mistaken application of the law. The trial court stated, "[The Defendant] has one violation before. He served 365 days in jail. Credit for that. I don't see any alternative but to order that he serve the sentence. . . . The alternative of split confinement has already been fulfilled, I can't do that anymore." The trial court also stated that the Defendant "has just not done what he is required to do. . . and when you don't do what you are supposed to do, you just don't give the Court any alternative." Thus, the record does not clearly demonstrate that the trial court acted in opposition to, or based on, a mistake of the law. The sentence imposed by the court was well within its discretionary authority. This issue has no merit.

### III.  **Conclusion**

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE